IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JULIE LESICKO,                          )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )          Case No. 07-cv-0826-MJR-DGW
                                        )
CONOCOPHILLIPS PIPE LINE CO.,           )
                                        )
                    Defendant.          )

## MEMORANDUM AND ORDER

REAGAN, District Judge:

> ### A.      INTRODUCTION

Via complaint filed in this United States District Court on November 27, 2007, Julie Lesicko alleges that ConocoPhillips Pine Line Company (CP) discriminated against her on the basis of her gender and her age, in violation of Title VII of the Civil Rights Act of 1974, 42 U.S.C. 2000e, *et seq.,* and the Age Discrimination in Employment Act, 28 U.S.C. 621, *et seq.*[1]

More specifically, in Count 1 of her complaint, Lesicko claims she endured <u>disparate treatment</u> (*i.e.*, "because of her sex," CP denied her vacation requests, denied her training and unfairly disciplined her) and <u>sexual harassment</u>, all of which created a hostile work environment and ultimately resulted in her constructive discharge on March 1, 2007. The allegedly harassing conduct includes sexually suggestive comments made toward or in

---

[1]     Plaintiff commenced this action within 90 days of receiving a right-to-sue letter on her discrimination charges from the Equal Employment Opportunity Commission (EEOC).

front of Lesicko, sexually explicit photos/magazines in coworkers' lockers and desks, and a pornographic image placed in her locker, behavior which Lesicko claims CP condoned or failed to prevent.

In Count 2, Lesicko alleges that CP subjected her to unlawful age discrimination by denying her vacation requests and refusing to permit her to attend training that would have "afforded Plaintiff the opportunity for promotion," all of which caused her constructive discharge on March 1, 2007.

This Court enjoys subject matter jurisdiction under the federal question statute, 28 U.S.C. 1331. Trial is set to commence before the undersigned Judge on March 9, 2009.

Now before the Court is CP's December 12, 2008 summary judgment motion (Doc. 22), which was fully briefed as of January 29, 2009. For the reasons stated below, the Court hereby grants CP's motion.

B.    APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FEDERAL RULE OF CIVIL PROCEDURE 56(C).**

To defeat summary judgment, the nonmoving party must do more than raise a metaphysical doubt as to the material facts. Instead, she "must come forward with specific facts showing that there is a genuine issue for trial."

***Keri v. Board of Trustees of Purdue Univ.,*** **458 F.3d 620, 628 (7th Cir. 2006),** ***cert. denied***, **549 U.S. 1210 (2007),** ***citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*** **475 U.S. 574, 586 (1986).**

This Court can find a genuine issue of material fact precluding summary judgment "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." ***Argyropoulos v. City of Alton***, **539 F.3d 724, 731 (7th Cir. 2008),** ***quoting Sides v. City of Champaign,*** **496 F.3d 820, 826 (7th Cir. 2007).** Bearing these standards in mind, the Court assesses the record before it, having carefully reviewed all the materials submitted with the summary judgment briefs.

Those materials include, *inter alia*, deposition excerpts of Plaintiff Julie Lesicko (who worked at CP from June 1995 to March 2007), Gerald Lesicko (whom Julie married in June 2002), Glen Morgan and James Rugg (both of whom supervised Julie Lesicko at CP) and Jeffrey Slaby (CP's District Director); discovery responses filed on behalf of Julie Lesicko; affidavits submitted by Morgan, Rugg, and two coworkers of Julie Lesicko (Becky Zimmer and Mike Hagan); handwritten notes and memoranda from CP managers; and materials from Julie Lesicko's personnel file (*e.g.*, warning letters issued to Julie Lesicko, internal memoranda regarding possible violation of CP policies by Julie Lesicko, and Julie Lesicko's March 2007 resignation letter).[2]

---

[2]     Plaintiff Julie Lesicko is referred to simply as "Lesicko" hereafter.

C.    <u>ANALYSIS</u>

Lesicko's complaint contains sex discrimination and age discrimination claims.  Title VII of the Civil Rights Act of 1964 makes it unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."  **42 U.S.C. § 2000e-2(a)(1).**  One type of sex discrimination claim involves disparate treatment based on gender.  "Proof of intentional discrimination is required" for a disparate treatment claim.  ***Hildebrandt v. Illinois Department of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003).**  An employer also violates Title VII by sexual harassment which affects the terms and conditions of employment.  ***Id.*, 347 F.3d at 1033.**

The ADEA declares it unlawful for an employer to discharge or discriminate against an individual in the terms and conditions of her employment based on her age.  **29 U.S.C. § 623(a)(1); *Peirick v. Indiana University-Purdue University*, 510 F.3d 681, 694 (7th Cir. 2007).**

To establish a claim under the ADEA, an employee must show that her age "actually motivated" the employer's decision against her.  ***Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 641 (7th Cir. 2008), *quoting Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000), and *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).**  In other words,

the employee must show that her age "actually played a role in the decision-making process and had a determinative influence on the outcome." **Faas, 532 F.3d at 641. Accord Hemsworth v. QuoteSmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007).**

In both Title VII disparate treatment cases and ADEA cases, a plaintiff may show discrimination under either the "direct" or the "indirect" method of proof. **Brown v. Illinois Department of Natural Resources, 499 F.3d 675, 681 (7th Cir. 2007).**

The direct method of proof involves admissions by the employer, near-admissions by the employer, and more attenuated circumstantial evidence that "suggests discrimination through a longer chain of inferences." **Faas, 532 F.3d at 641; Hemsworth, 476 F.3d at 490.** By contrast, the indirect method of proof involves a "certain subset of circumstantial evidence that includes how the employer treats similarly situated employees and conforms to the prescription of McDonnell Douglas Corp. v. Green." **Faas, 532 F.3d at 641.**[3]

The United States Court of Appeals for the Seventh Circuit has been critical of this nomenclature, because the phrase "direct method" erroneously

---

[3] "The rubric of the indirect method was first set forth in McDonnell Douglas Corp. v. Green.... Under this methodology, [the plaintiff] may create a presumption of discrimination by establishing a prima facie case of discrimination." **Atanus v. Perry, 520 F.3d 662, 672 (7th Cir. 2008), citing Bahl v. Royal Indemnity Co., 115 F.3d 1283, 1290 (7th Cir. 1997).**

implies that an employee must proceed with direct evidence.  **See Faas, 532 F.3d at 641, and Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1052 (7th Cir. 2006)(the distinction between the two avenues of proof is "vague," and the terms "direct" and "indirect" are themselves "somewhat misleading....").**

The Seventh Circuit has explained:

> "Direct" proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion *(e.g.,* "You're too old to work here."), but also *includes circumstantial evidence* which suggests discrimination through a longer chain of inferences."*...* The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action.

**Atanus, 502 F.3d at 671-72, citing Luks, 467 at 1052, and quoting Sylvester v. SOS Children's Villages Illinois, Inc., 453 F.3d 900, 902-03 (7th Cir. 2006).**

CP contends that Lesicko has identified no direct evidence of gender-based disparate treatment in her pleadings or in discovery, so she must rely on the indirect method of proof  (Doc. 23, p. 9).   Lesicko counters that some of her evidence *does* constitute direct evidence of discrimination based on gender (Doc. 28, p. 4).

Specifically, Lesicko characterizes as "direct evidence" comments

by Terminal Superintendent Glen Morgan (a) querying whether she had been "busy with all the men I see" (her coworkers) over the weekend and (b) stating that he knew Lesicko "had a lot of boyfriends" (*id.*).

Under the direct method of proof, circumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class, and the employer's reason is a pretext for discrimination." ***Atanus*, 520 F.3d at 671-72.**

Lesicko has neither identified evidence which "points directly" to a discriminatory reason for any of CP's challenged actions nor presented circumstantial evidence of the above-delineated nature.  As CP correctly notes, Lesicko has not proffered any allegation which, if believed, "would prove the fact in question without reliance on inference or presumption."  Doc. 31, p. 4, ***quoting Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005).**

The comments Lesicko characterizes as *direct* evidence (by Superintendent Morgan regarding Lesicko "getting busy" and having "a lot of boyfriends") were made in 1999 or 2000 (Doc. 28, p. 4).  But these comments

cannot constitute the basis for a Title VII claim herein, as they are time-barred.[4] *See, e.g., Cardoso v. Robert Bosch Corp.*, **427 F.3d 429 (7th Cir. 2005).** Furthermore, even if these comments could be considered, the record contains nothing to connect them to Lesicko's resignation or "constructive discharge" seven years later.

Because Lesicko has presented no direct evidence of discrimination, the Court analyzes "her indirect proof using the familiar burden-shifting method" of *McDonnell Douglas v. Green*. ***Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591-91 (7th Cir.), *cert. denied*, 129 S. Ct. 738 (2008); *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007).**

Under *McDonnell Douglas,* a plaintiff must first make out a prima facie case of gender discrimination. Lesicko may do so by showing: (1) she is a member of the protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated male employees more favorably. **Peirick, 510 F.3d at 687; *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 696 (7th Cir. 2006).** If Lesicko does so, then CP must offer a legitimate

---

[4] Under Title VII, Lesicko had 300 days from the date of CP's alleged unlawful practices to file a discrimination charge with the EEOC. She filed her charge April 3, 2007 (Exh. G to Doc. 23). So, working back from that date, Lesicko's Title VII claims may be based only on incidents that took place on or after June 7, 2006.

nondiscriminatory reason for any adverse employment action, which Lesicko can rebut by showing that CP's reason is a mere pretext for discrimination. ***Id.***

Lesicko's age discrimination claim is analyzed the same way. Indeed, **to establish a prima facie case of discrimination under *either* Title VII or the ADEA**, the employee must proffer evidence that: (1) she belongs to a protected class; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by CP. ***Atanus*, 520 F.3d at 672-73, *citing Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).**

Summary judgment is appropriate if the employee "fails to establish any of the foregoing elements of the prima facie case." ***Atanus*, 630 F.3d at 673, *citing Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).** In the case *sub judice*, Lesicko has not and on the record before the Court (construing all facts and reasonable inferences in her favor) *cannot* meet her prima facie case, dooming her disparate treatment gender discrimination claim and her age discrimination claim.

The first prong presents no problem. Lesicko belongs to a protected class (she is a woman, and she is over 40 years old). But she has failed to satisfy her burden as to the second prong of the prima facie case, which requires her to show that she was meeting CP's legitimate expectations.

The undisputed facts reveal this plainly. CP transports petroleum products, including gasoline, diesel, jet fuel and propane. Lesicko worked at CP's East St. Louis, Illinois terminal, within this Judicial District. She was one of 18 employees working at the East St. Louis terminal.[5] Lesicko started with CP around June 1, 1995 as a Clerk in that office. When her employment ended on March 1, 2007, she was an Operator. What happened in the interim bears directly on assessment of Lesicko's prima facie case of gender and age discrimination.

In her initial job as Clerk, Lesicko handled communications with other CP facilities in the Midwest, including the Decatur, Illinois facility. Glenn Morgan (a CP employee from 1971 through 2007) worked in CP's Decatur facility in 1996 and transferred to the East St. Louis Terminal in 1997. Morgan was a Facility Supervisor in East St. Louis, working in the same office as Lesicko for a period of time before he became Terminal Superintendent in 2000. As Superintendent, Morgan supervised all employees at the East St. Louis Terminal, including Lesicko.

After working as a Clerk, Lesicko became a Yardman. That position

---

[5] The complaint alleges, and CP admits, that CP is an employer who "at all relevant times," continuously employed over 15 persons and was engaged in an industry affecting commerce within the meaning of the relevant statutes (*see* Doc. 2, ¶¶5-6; Doc. 5, pp.1-2).

is a "laborer's type position," as opposed to a clerical position (Morgan Depo., pp.34-35). Morgan recalled no problems with Lesicko while she worked as a Yardman (*id.*, p. 43).

Lesicko was promoted to Operator in 1999. To obtain that position, Lesicko first worked as an apprentice and then was certified as qualified (by Morgan) for the Operator job. While working as an Operator, Lesicko was a union member subject to a collective bargaining agreement.[6]

In late 1999, James Rugg became the East St. Louis Terminal Supervisor. From roughly 2000 to 2003, Rugg supervised Lesicko and reported to Morgan. During this time, the East St. Louis Terminal changed from three 8-hour shifts daily to two 12-hour shifts daily.

In early 2001, while reviewing attendance reports following this transition, Rugg saw that several CP employees (including Lesicko) were taking sick leave, referred to as Unavoidable Absence Benefits or "UAB," in conjunction with their scheduled days offs, and in this way extending their weekends or breaks. This created problems for CP, because if an employee failed to report for a shift, CP had to run that shift shorthanded or pay overtime to cover the shift.

---

[6] The record indicates that Lesicko initially performed well in the position. For instance, on January 5, 2001, Morgan recognized Lesicko for "attentive practices" which avoided a potential butane spill (*see* Exh. C to Doc. 28). This did not last, however.

So Rugg raised the issue with the Operators (Lesicko and her coworkers) at operational meetings and safety meetings. When Lesicko continued to take UAB on either side of her scheduled days off, Rugg met with and counseled her individually.

In June 2001, Rugg and Morgan issued a verbal warning to Lesicko and told her she would have to submit a doctor's excuse for future use of UAB "tied to her days off" for the remainder of 2001.[7] Although the problem abated for a time, Lesicko resumed the unauthorized use of sick leave in late 2002. Between December 2002 and June 2003, on four occasions, Lesicko called in sick (took UAB) just prior to weekends or planned eight-day-off cycles. She would thereby create three-day weekends or four-and-a-half-day weekends or nine consecutive days off work.

In May and June 2003, Rugg again noticed this pattern in reviewing employee attendance records. He documented this in an email to Morgan, Teresa Evans in Human Resources and other CP managers (*see* Exh. 5 to Doc. 34-2). On June 26, 2003, after consulting with the Human Resources Department, Rugg issued Lesicko a written warning for excessive absenteeism (*see* Exh. 4 to Evans Depo., Doc. 23-5).

The record reflects many other work-related problems with Lesicko,

---

[7]     Rugg also met with other employees who were abusing their sick leave, including male employees (Rugg Affidavit, Doc. 34-2 at ¶ 11).

*before and after* she was disciplined for excessive absenteeism.  In August and September 2002, Rugg documented four reports concerning hostile and inappropriate interaction by Lesicka with coworkers and supervisors (*see* Incident Reports, Exhs. 1-4 to Doc. 34-2).

For instance, at meetings in August and September 2002, in front of other employees, Lesicko referred to Rugg as a "liar" and as "incompetent." She also told Rugg that he would not be working at CP much longer, a comment which Rugg interpreted as insubordinate.

Additionally, on September 10, 2002, CP employee Don Tucker (a coworker of Lesicko) appeared unsolicited in Rugg's office and reported that he was afraid and troubled by incidents with Lesicko that involved sarcastic remarks by Lesicko, vulgar outbursts by Lesicko, "verbal abuse" by Lesicko, "angry words" by Lesicko, constant public "attacks" on people Lesicko worked with, and "threats" by Lesicko which left Tucker feeling "he couldn't be in the same room" with Lesicko anymore (Exh. 3 to Doc. 34-2).

On September 24, 2002, a meeting was held to discuss these problems with Lesicko. At that meeting, Lesicko was verbally counseled for inappropriate conduct "resulting in creation of a hostile work environment" by Rugg, Morgan, Region Manager C.A. Hill and John Ralston from CP's Human Resources Department (*see* Evans Affidavit, Doc. 23-5, ¶ 4; Rugg Affidavit,

Doc. 34-2 ¶¶ 12-13).[8]

On October 10, 2002, Region Manager Hill issued Lesicko a written warning for creation of a hostile work environment by her "intimidating verbal communications" with coworkers and her "repeated inappropriate behavior," all of which was detrimental to morale (*see* Exh. 3 to Doc. 23-5).  She was reminded that good morale and teamwork was needed for a safe workplace and admonished that CP "will no longer tolerate these outbursts and unacceptable behavior against any employees" (*id.*).  Indeed, Hill flatly warned Lesicko that unless she showed an immediate and substantial change to acceptable behavior, "you will be subject to disciplinary action up to and including termination of your employment" (*id.*).  Although Lesicko expressed a willingness to change, on-the-job problems persisted.

In 2003 and 2004, Lesicko worked as Leadman Operator. Operators transport explosive materials – taking products off the pipe line and moving them to storage facilities for pickup by tanker trucks who then deliver the products to local retail outlets.  Because they are handling dangerous products, Operators must be safety-conscious and must maintain a trusting working relationship with their coworkers.

Lesicko acknowledges that the Operator and Lead Operator jobs are

---

[8]     Two union stewards, Herschel Riddle and Roger Schubert, attended the September 24, 2002 meeting with Lesicko.

"dangerous positions," with employees working around and with "a lot of volatile products all around," requiring coworkers to work cohesively and "treat each other with civility always" (Doc. 23-3, p. 5). Lesicko concedes that she had conflicts with coworkers (specifically, Becky Zimmer), but she characterizes these as minor disagreements and denies that she diminished on-the-job morale or created a hostile work environment by her behavior at work.

The record clearly reveals that Lesicko's behavior negatively impacted the relationship between employees at CP as well as the relationship CP had with customers. For example, on June 12, 2003, a Clerk in CP's East St. Louis Terminal (Michelle Marty) received a call from "Rick," a manager with Dillon Transportation. Dillon is a trucking company that ships CP products. Rick complained that the previous night an Operator named Julie (later identified at Lesicko) had been extremely rude to a Dillon driver.

Michelle Marty reported the complaint to James Rugg, who relayed it to Teresa Evans in Human Resources (*see* Exh. 6 to Doc. 34-2). Rugg's email to Evans reflects CP's ongoing concerns regarding Lesicko's behavior at work: "another note from 3rd party dealings with this employee [Lesicko]. It is this work environment that I worry most about." The June 26, 2003 written warning issued to Lesicko for excessive absenteeism (described above) followed two weeks after the Dillon complaint.

On September 2, 2006, a call was made to CP's "AlertLine" (a toll-

free hotline which allows employees to anonymously report workplace misconduct) complaining that Lesicko's conduct was creating a hostile workplace (*see* Exh. 6 to Doc. 23-5, AlertLine Confidential Memorandum of Call, and Evans Affidavit). That call prompted Theresa Evans of Human Resources to interview employees (both male and female) at the East St. Louis Terminal on September 7 and 8, 2006 (*id.*). The employees told Evans that Lesicko's behavior caused them fear, anxiety and concern.

They reported that LESICKO threatened her coworkers with lawsuits, screamed and cursed at them, cussed and used the "f word" at coworkers and drivers, was abusive to them, was volatile, created turmoil in the building, threatened to get them fired and created a stressful working environment (*see* Evans Affidavit, Doc. 23-5, ¶¶7-8, and Exh. 7 to Doc. 23-5, 9/9/06 summary of employee interviews). One specific example was a male employee who actually told his wife "that if he doesn't come home one night and they find him dead in the ditch, she needs to direct the police to Julie [Lesicko]" (Exh. 7 to Doc. 23-5).

The investigation culminated in CP issuing Lesicko a one-day suspension and a "Final Warning" letter on September 22, 2006 (Evans Affidavit at ¶ 10). The Final Warning letter summarized the results of the investigation, which indicated unacceptable behavior towards coworkers, contractors, and truck drivers "that is inappropriate and contributes to a hostile work

environment" (Exh. 5 to Doc. 23-5).

The letter referenced prior disciplines for unacceptable on-the-job behavior, emphasized that Lesicko's abusive comments and perceived threats to coworkers "must stop immediately," and pointedly stated: "This is your final warning that any future such behavior on your part will result in termination of your employment" (*id.*).  The letter required Lesicko to contact a counselor in CP's Employee Assistance Program and concluded: "Failure to fully comply with the expectations outlined in this memo will result in termination of your employment."

Six months later, trouble arose again.  On February 21, 2007, Becky Zimmer (an Operator at the East St. Louis Terminal) heard Lesicko opening and closing desk drawers in an adjacent office.  Lesicko told Zimmer that she was looking for an operating manual and a part for some lab equipment that she needed to take to the test room.  According to Zimmer (*see* Zimmer Affidavit, Doc. 23-6), Zimmer offered to help Lesicko and suggested Lesicko leave the original of the operating manual and take a copy to the test room (Zimmer supplied a copy).  This did not sit well with Lesicko.

After leaving the room where Zimmer was, Lesicko walked into the control room and announced to Lead Operator Mike Hagan that she was going to "kick the bitch's ass," referring to Becky Zimmer (*see* Hagan Affidavit, Doc. 23-7).  Lesicko denies making this statement to Hagan (Lesicko Depo. at p. 50;

Doc. 28-2 at p. 11).

Later that day and the following day (February 21 and 22, 2007), Morgan and Evans investigated the report of this incident. They interviewed the two people in the control room at the time Lesicko supposedly made the statement – Scott Wittenbrink and Mike Hagan. Wittenbrink – who was only going through the area to use the restroom – said "he knew what we were talking about but that he really didn't hear anything," because he "'toned it out' and didn't listen" (Doc. 28-9, p. 2). Hagan, after initially expressing reluctance to "rat on a fellow employee," confirmed that he heard Lesicko state she was going to "kick the bitch's ass" referring to Zimmer (*id.*; Hagan Affidavit, Doc. 23-7, ¶¶ 3-5). *See also* Morgan Affidavit, Doc. 23-2, ¶ 11; Evans Affidavit, Doc. 23-5, ¶ 11; Zimmer Affidavit, Doc. 23-6, ¶ 9.

Lesicko was not scheduled to work for the next 8 days. During that time, Jeff Slaby and others at CP tried several times to reach Lesicko by telephone and mail to request a meeting to discuss the February 21st events and hear her "side" of the encounter. Lesicko, however, refused to talk to them or report to the Terminal until her return date of March 1, 2007 (*see* Lesicko Depo., vol. 1, pp. 148-149; Doc. 28-12; Evans Affidavit at ¶ 13). Anticipating that she would be disciplined for the February 21st incident, Lesicko decided to resign *before* she returned to work on Thursday, March 1, 2007 (Lesicko Depo., vol. 1., p. 148).

When Lesicko returned to work on March 1st, she (accompanied by union steward Herschel Riddle) walked into the office of District Director Jeff Slaby. Gathered in the office were Slaby, Morgan, and Terminal Supervisor Lowell Thornhill. According to Morgan, Lesicko walked in the office, immediately handed Slaby a typed letter of resignation, refused to participate in the meeting or explain her conduct, and after listening to only a few sentences by Slaby (who was reading from hand-written discussion points he had prepared for the meeting), announced "meeting over" and abruptly left (*see* Morgan Affidavit, Doc. 23-2, ¶¶ 14-15; Lesicko resignation letter, Exh. 9 to Doc. 23-5; Slaby notes, Doc. 28-5, pp. 26-27).

In ruling on a summary judgment motion, this Court views the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party (here, Lesicko). ***TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).** So construed, the record before this Court demonstrates that Lesicko was not meeting CP's legitimate job expectations.

Even if she could show that she was satisfactorily performing at work, and assuming *arguendo* that she suffered an adverse employment action, Lesicko has not met the fourth element of her prima facie case. She has not identified another *similarly situated* male or *similarly situated* younger worker

who was treated more favorably than she. For instance, as to her claim of disparate treatment by way of unfair discipline, Lesicko has not identified a single male CP employee who engaged in similar behavior or conduct as she and received lesser discipline.

Lesicko's failure to satisfy the prima facie case dooms her gender discrimination (disparate treatment) claim and her age discrimination claim. *See Atanus*, **630 F.3d at 673 (summary judgment is appropriate if the employee "fails to establish any of the foregoing elements of the prima facie case.").**

As explained in the Introduction, supra, Lesicko's complaint contains two counts – Count I for gender-based discrimination under Title VII and Count II for age-based discrimination under ADEA. Count I mingles claims of disparate treatment (prima facie case addressed above) with claims of sexual harassment (prima facie case addressed below). Both counts allege that CP's conduct resulted in Lesicko's constructive discharge on March 1, 2007. The Court now turns to the sexual harassment and constructive discharge claims, which fail as a matter of law.

Lesicko alleges that she was subjected to sexual harassment which CP neglected to address and which created a hostile working environment for her and ultimately forced her to resign. To establish a prima facie case of sexual harassment under Title VII, an employee must show that (1) she was

subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. ***Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007); *Kampmier,* 472 F.3d at 940.**

To meet the first prong of the prima facie case, Lesicko proffers the following. First, she points to the 1999/2000 comments by Glen Morgan about Lesicko having "a lot of boyfriends" and "getting busy" over the weekend.

Next, she directs the Court's attention to comments by coworkers sometime in 2005 about a fishy smell resulting from the draining of a lake at the south end of CP's property. According to Lesicko: "As the water receded, the fish were left on the muddy surface to die and rot. Comments and jokes about the smell of that area with references to women were made in my presence by my male co-workers … in the presence of Glen Morgan and Lowell Thornhill." She asserts that since supervisors were present and laughed at the coworkers comments, CP was "in effect condoning this behavior" (Doc. 28, p. 8; Plaintiff's Interrogatory Answer #3; Doc. 28-15, p. 5; Lesicko Depo., p. 100).

Next, Lesicko describes a Summer 2005 occurrence in which she encountered a shirtless janitor ("Kenny") while working the night shift. She asked why he took his shirt off, and Kenny (who was not a CP employee but a subcontractor) said that it was hot, his car was not working, and he had walked

a long distance.  Lesicko complained that Kenny continued cleaning without a shirt.  She was further aggravated when Glen Morgan asked her to give Kenny a ride to the front office in a company truck, since CP policy prohibited non-employees from riding in CP vehicles.  When Lesicko expressed reluctance to comply with this directive, Morgan yelled at her to "just do what I say."

In April 2006, Lesicko found in her locker a graphic and sexually explicit photograph torn from a magazine.  Additionally, she complains that male employees left sexually explicit reading material in the drawer of a common desk and in their lockers.  Around this time, Lesicko found what she perceived to be a picture of a penis drawn onto a picture of a dog that appeared in a news magazine.  She took the magazine to Terminal Superintendent Morgan who, according to Lesicko, rolled his eyes and asked if this really offended her (Lesicko Depo., Doc. 23-3, p. 118).  When Lesicko responded that it did offend her, Morgan said he "would look into it" (*id.*).  Even though Morgan himself could not *see* a penis drawn on the picture of the dog after holding it up to the light and scrutinizing it closely, Morgan followed up and relayed this concern to Theresa Evans in Human Resources (*id.*; Morgan Depo., Doc. 28-3, pp. 119-120).

Similarly, in April or May 2006, when the report of pornographic materials in the workplace reached him, Morgan went to the control room, opened desk drawers and searched for any offensive materials.  He found some

hunting magazines but nothing of an inappropriate nature (Morgan Depo., Doc. 28-3, pp. 92-94). Morgan made several such "sweeps" of the Terminal but discovered nothing.[9] And after Lesicko spoke to Morgan in May 2006 on this topic, he sent all employees a reminder of CP's policy against sexual harassment (Lesicko Depo., vol. 1., pp. 118-119).[10]

All of the above-described allegedly harassing acts are time-barred. As explained above, Lesicko's Title VII claims can be based only on discrete incidents that took place on or after June 7, 2006. **See Cardoso, 427 F.3d at 432 (any claims based on discrete acts outside the 300-day window prior to filing of employee's EEOC charge were time-barred and subject to summary judgment).**

Even if this evidence is *not* time-barred or can be properly considered by this Court,[11] and as to the timely or arguably timely evidence Lesicko does present (*e.g.,* allegations relating to "thiefing" tanks in the

---

[9] In the Summer of 2006 (possibly July), CP had a professional team come to the facility to conduct a contraband search. The team, including 4 investigators plus dogs, found a single two-year old "Maxim" or "Maximum" magazine, "stuffed with other papers on the dash of a company vehicle" (Morgan Depo., Doc. 28-3, pp. 94-95).

[10] CP maintains a sexual harassment policy which it distributes and explains to all employees at orientation (*see* Exh. 8 to Doc. 23-5).

[11] **See, e.g., Fischer v. Avanade, Inc., 519 F.3d 393, 401 (7th Cir. 2008)(in Title VII sex discrimination case, Court noted that "earlier, time-barred incidents" can be considered "as support for a timely claim").**

Summer of 2006, EAP Coordinator Dennis Mongello's comments about "problems in the bedroom" affecting work, denied training opportunities in 2007 and denied vacation requests in late 2006 and 2007), Lesicko has not shown that the alleged acts of harassment were based on her <u>sex</u> (prong two of the prima facie case) or were sufficiently severe and pervasive to alter the conditions of her employment (prong three).  ***See Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008)(To establish a Title VII claim based on sexual harassment, employee must "prove that a reasonable person would find the alleged harassment to be so severe or pervasive as to create a hostile work environment, thus affecting the terms and conditions of her employment" and that there exists a "link between this treatment and [their] sex.").**

It is true that sexual harassment "can include employer action based on [sex] but having nothing to do with sexuality."  ***Boumehdi*, 489 F.3d at 788, *citing Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)(harassing conduct need not be motivated by sexual desire to support an inference of discrimination based on gender).**

Put another way, sexual harassment need not be based on sexual *desire*.  ***Hildebrandt*, 347 F.3d at 1033.**  But the employee must demonstrate that the behavior in question was both subjectively *and* objectively offensive.  ***Boumehdi*, 489 F.3d at 788, *citing Rhodes v. Illinois Department of***

***Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).**

Reviewing all the evidence Lesicko proffers (ignoring any time limitation based on the filing date of her EEOC charge) and construing in Lesicko's favor the inferences reasonably drawn from the evidence, the Court can finds as follows.  Lesicko was *subjectively* offended by certain occurrences at the workplace.  But, taking into consideration all the factors (including the frequency of the conduct alleged, the severity of the conduct, and whether it was physically threatening or just constituted offensive utterances), ***see Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000),** the alleged harassment was not *objectively* offensive.

"'Occasional vulgar banter, tinged with sexual innuendo of coarse and boorish workers' generally does not create a work environment that a reasonable person would find intolerable."  ***Boumehdi*, 489 F.3d at 788, *quoting Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).**

The law differentiates between truly harassing and merely objectionable conduct.  Furnishing guidance on how to evaluate the severity of harassment, the Seventh Circuit has distinguished sexual assaults, nonconsensual physical contact and intimidating actions/words from crude shoptalk, trivial harms and isolated instances of non-severe misconduct.  ***See, e.g., Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 772**

(7th Cir. 2008); *Patton v. Keystone RV Co.,* 455 F.3d 812, 816 (7th Cir. 2006); *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645-56 (7th Cir. 2005), *cert. denied*, 548 U.S. 924 (2006).  *See also Kampmier*, 472 F.3d at 941, *citing Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002)(supervisor rubbing employee's back and staring at her chest while telling her to raise her arms and open her blazer did not create a sufficient inference of a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002)(eight gender-related comments including that "the only valuable thing to a woman is that she has breasts and a vagina" were insufficient to demonstrate hostile work environment); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998)(comments about bananas and low-neck tops, staring, and four isolated incidents where a co-worker briefly touched plaintiff's arm and buttocks did not constitute sexual harassment). "In short, minor or isolated incidents are generally insufficient to rise to the level of objectively offensive conduct." *Kampmier*, 472 F.3d at 941.

For all these reasons, Lesicko has not established a prima facie case of sexual harassment.  Her allegations of constructive discharge (contained in both counts of the complaint but discussed in the briefs as if a separate claim) are likewise unavailing.

Constructive discharge is deemed to have occurred when the employee "shows that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." ***Fischer*, 519 F.3d at 408, *quoting EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002).** The record before this Court *precludes* the conclusion that (judged from a reasonable employee's perspective) Lesicko's working conditions had become so intolerable she could no longer continue working at CP.

Indeed, the record before this Court is replete with uncontroverted evidence that it was *Lesicko* who made the working conditions difficult to bear for her coworkers – creating stress, stirring up turmoil, verbally intimidating them and damaging morale. Assuming all her allegations to be true and timely, nothing identified by Lesicko rises to the level that constitutes constructive discharge under the governing caselaw.

And the final events culminating in her March 1st departure from CP warrant the same conclusion – she was not constructively discharged by CP. The undisputed facts demonstrate that Lesicko knew she would be asked about her behavior in the Zimmer incident, she effectively ducked her supervisors' calls during eight days off work, and – the day she returned to work (March 1, 2007) – she marched into Jeff Slaby's office and  tendered a formal, 5-paragraph, typewritten letter of resignation (Doc. 23-5, Exh. 9) without

participating in the meeting that had been convened, hearing out Slaby or talking with the other CP managers. No constructive discharge has been shown.

Finally, in response to summary judgment, Lesicko asserts that there is a genuine issue of material fact "as to whether Julie has shown *retaliatory* constructive discharge" (Doc. 28, p. 23, emph. added). To the extent this refers to the constructive discharge allegations discussed above (contained within her Title VII and ADEA counts), no such fact issues exist, and the Court rejects the claim. To the extent Lesicko endeavors to add a *new* and separate claim for retaliation, one not contained in her two-count sex discrimination and age discrimination complaint, that attempt comes too late, with discovery completed, the dispositive motion deadline elapsed, and trial just around the corner.

### D.   CONCLUSION

Julie Lesicko has identified (and this Court can find) no genuine issue of material fact in the voluminous record. Lesicko has failed to make a prima facie case on any of her claims, including those claims based on Title VII and those claims based on the ADEA.

Because the pleadings, the discovery, the affidavits and all the other exhibits before the Court "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law,"

the Court **GRANTS** CP's motion (Doc. 22).

The Clerk of Court shall **ENTER JUDGMENT** in favor of Defendant CP and against Plaintiff Julie Lesicko.

This Order results in the cancellation of all further settings herein, including the February 27th final pretrial conference and the March 9th jury trial.

IT IS SO ORDERED.

DATED this 5th day of February 2009.

s/ *Michael J. Reagan*
MICHAEL J. REAGAN
United States District Court